PROVIDED TO
HAMILTON
OCT 1 9 2018
RECEIVED BY 
FOR MAILING

UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

DAVID T. CURRY,
    Plaintiff,

vs.                        CASE NO: <u>4:18-CV-207 RH/CAS</u>

JULIE L. JONES, et al.,
    Defendants.
_____ /

## **PLAINTIFF'S SECOND AMENDED COMPLAINT**

Plaintiff, David T. Curry, ("Mr. Curry") *Pro Se*, and pursuant to Federal Rules of Civil Procedure 15, hereby files this Second Amended Complaint against Defendant- Secretary Julie L. Jones, Defendant- Dr. Simone Vilchez, MD., and Defendant- Dr. Luis Lopez, MD., (Collectively, "Defendants"), and in support thereof would state as follows:

1. This is a civil action for monetary damages for Defendants' deliberate indifference to Mr. Curry's serious medical needs. Defendants failed and/or refused to provide life- saving Hepatitis-C treatment to Mr. Curry

AH
FILED USDC FLND TL
OCT 23 '18 PM 12:18

while incarcerated in the Florida Department of Corrections ("FDC"). Defendants' policies, practices and customs have resulted in Mr. Curry's suffering and put him at serious risk of liver failure, cancer and death- despite the facts that: (1) consensus among medical professionals is that all persons with chronic Hepatitis- C virus ("cHCV") should be treated with Direct- Acting Antiviral ("DAA") drugs; (2) medications that can cure his cHCV with little to no side effects have been readily available since 2013; (3) the medical standard of care requires treatment for all prisoners such as Mr. Curry; and (4) Defendants had the financial ability to provide the treatment to Mr. Curry.

2. Defendants' deliberate indifference to Mr. Curry's serious medical needs violates the Eighth Amendment to the United States Constitution, and several state tort laws. Further, Defendants' failure to address Mr. Curry's medical needs amounts to discrimination on the basis of disability in violation of the Americans with Disabilities Act and the Rehabilitation Act.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 as this is a civil action arising under the United States Constitution.

4. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1343 (a)(3) as this action seeks to redress the deprivation, under the color of the state law,

of rights secured to the plaintiff by the United States Constitution and laws of the United States.

5. To the extent any of the issues or claims raised herein lie beyond the Court's original jurisdiction, this Court has supplemental jurisdiction under 28 U.S.C. § 1367, because such issues or claims are so related to the claims within the Court's jurisdiction that they form part of the same case controversy.

6. Mr. Curry's claims for relief are predicated, in part, upon 42 U.S.C. § 1983, which authorizes actions to redress the deprivation, under color of State Law, of rights, privileges and immunities secured by the Constitution and laws of the United States.

7. Mr. Curry's claims are also brought pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, and the rehabilitation Act ("RA"), 29 U.S.C. § 794, and pursuant to 42 U.S.C. 12205 and 29 U.S.C. § 794a, which authorizes an award of attorney's fees and costs to a prevailing plaintiff.

8. Venue is properly established in this judicial district pursuant to 28 U.S.C. § 1391 (c), as Defendants do business or reside in this judicial district and/or division, and many of the events or omissions given rise to the claims occurred in this judicial districts and/or division.

9. Mr. Curry has attempted to satisfy all conditions precedent prior to filing this § 1983 case. To the extent any condition precedent has not been satisfied, this is

the result of: (1) an administrative procedure was unavailable because, despite what regulations or guidance materials may promise, it operated as a simple dead end- with staff members unable or consistently unwilling to provide any relief to aggrieved inmates; (2) the administrative scheme was so opaque that is was, practically speaking, incapable of use; or (3) Defendants actively prevented Mr. Curry from satisfying the condition precedents.

## PARTIES

10. At all times material hereto, Plaintiff **DAVID T. CURRY** is a citizen of the United States. He resided in the FDC at all relevant times in this action. During his time in the FDC, Mr. Curry suffered from Hepatitis- C virus and was not provided appropriate treatment for his condition. Mr. Curry continues to suffer as a direct result of Defendants' actions and/or policies, practices and customs.

11. At all times material hereto , Defendant **JULIE L. JONES** ("Ms. Jones") acted in her official and individual capacity as Secretary for the Florida Department of Corrections. She was and is responsible for the general oversight of the FDC, maintenance of the FDC security and the functions to ensure the safety and well-being of the prisoners. Ms. Jones' duties require compliance with both the United States Constitution and Federal laws, including the duty to ensure that prisoners are provided with constitutionally adequate medical care. Ms. Jones was acting within the scope of her employment and acting under color of state

law, to wit, under color of the statutes, ordinances, regulations, policies, customs and usage's of the State of Florida. Ms. Jones is a resident of Florida. Mr. Curry has complied with the notice requirements of section 768.28 of the Florida Statutes by sending notice by certified mail to Ms. Jones. Pursuant to section 768.28 of the Florida Statutes, Ms. Jones does not have immunity for violating the civil right of citizens and has waived sovereign immunity for negligent acts, omissions, or intentional torts of its employees arising out of and in the course and scope of their employment.

12. At all times material hereto, Defendant **DR. SIMONE VILCHEZ, MD.** ("Dr. Vilchez") was a Medical Director at Gulf C.I.- annex and employee and agent of Centurion and FDC. He was also a resident of Florida. He acted within the scope of his employment and under color of state law, to wit, under color of the statutes, ordinances, regulations, policies, customs and usage's of the State of Florida.

13. At all times material hereto, Defendant **Dr. LUIS LOPEZ, MD.** ("Dr. Lopez") was a Medical Director at Okaloosa C.I. and employee and agent of Centurion and FDC. He was a resident of Florida. He acted within the scope of his employment and under color of state law, to wit, under color of statutes, ordinances, regulations, policies customs and usage's of the State of Florida.

# FACTUAL ALLEGATIONS

### *The Hepatitis - C Virus:*

14. Hepatitis – C is a blood borne disease caused by the hepatitis – C virus ("HCV"). The virus causes inflammation that significantly impairs liver function and damages the liver's crucial role in digesting nutrients, filtering toxins from the blood, preventing disease and essentially making possible all metabolic processes in the body.

15. HCV is the leading cause of liver disease and liver transplant in the United States.

16. HCV can be either acute or chronic. Individuals with acute HCV, the virus will spontaneously clear itself from the blood stream within six months of exposure. *Chronic* HCV ("cHCV"), on the other hand, has a detectable HCV viral level in the blood at some time six months after exposure.

17. Individuals with cHCV develop *fibrosis* of the liver, a process by which healthy liver tissue is replaced with scarring. Scar tissue cannot perform the job of normal liver cells, therefore reducing liver function and resulting in the aforementioned symptoms, but with greater intensity. Fibrosis can also lead to Hepatocellular Carcinoma (liver cancer).

18. When scare tissue begins to take over the liver, this extensive fibrosis is termed *cirrhosis*. Cirrhosis causes additional painful complications – many of which

occur before cirrhosis – including widespread itching, arthritic pain throughout the body, kidney disease, jaundice, bruising, fluid retention with edema, internal bleeding, varices (enlarged veins that develop in the esophagus, or intestines which can burst), abdominal ascites (the accumulation of fluid in the peritoneal cavity of the abdomen), mental confusion, lymph disorders, and extreme fatigue.

19. Moreover, once a cHCV patients liver has cirrhosis, its effects may be irreversible. Some patients with cirrhosis may have too much scar tissue in the liver, even if the liver can heal to some degree once the virus is eliminated by treatment. If scar tissue persists, the patient may still experience the complications of cirrhosis, including liver cancer.

20. HCV is a physiological disorder or condition that effects one or more of the body systems, including, but not limited to, the digestive, gastrointestinal , immune, circulatory, cardiovascular and hemic systems and is therefore a physical impairment. This physical impairment substantially limits one or more major life activities, including, but not limited to, eating, walking, bending, lifting, concentrating, thinking and communicating; the operation of major body functions, such as the digestive, gastrointestinal, immune, circulatory, cardiovascular and hemic systems; and the operation of the liver.

21. For all FDC prisoners who have been diagnosed with cHCV, there is a record of their impairment.

22. The FDC regards all prisoners with cHCV as having a physical impairment that substantially limits one or more major life activities.

### *General Prevalence of Hepatitis – C:*

23. HCV causes serious medical needs.

24. Approximately 2.7 to 3.9 million Americans have cHCV.

25. In 2000, the United States Surgeon General called HCV a "silent epidemic" and estimated that as much as two percent (2%) of the adult U.S. population had HCV.

26. In 2013, HCV caused more deaths than sixty other infectious diseases combined, including HIV, Pheumococcal disease and tuberculosis.

27. Approximately 19,000 people die of HCV – caused liver disease each year in the United States.

28. HCV is the leading cause of liver transplants in the United States.

### *Standard of Care for HCV:*

29. For many years, there were no universally safe and effective treatments for HCV. Before 2011, the standard treatment for HCV, which includes the use of interferon and ribavirin medications, only worked for roughly one third of

patients, cause serious side effects that were often worse than HCV symptoms, and required treatment for up to ***48 weeks***.

30. In 2011, however, the Food and Drug Administration ("FDA") began approving new oral medications for HCV, called direct – acting antiviral ("DAA") drugs. At first, they were designed to work in tandem with the old regimen, but, beginning in 2013, the FDA started approving DAA medications that could be taken alone.

31. These DAA drugs – currently Sovaldi: (Sofosbuvir), Olysio (Simeprevir), Harvoni (Sofosbuvir/ Ledipasvir), Viekira Pak (Ombitasvir/ paritaprevir/ ritonavir/ dasabuvir), Daklinza (daclatasvir), Technivie (ombitasvir/ partaprevir/ ritonavir), Zepatier (elbasvir/ grazprevir), and Epclusa (sofosbuvir/ velpatasvir)- have had fewer side effects, dramatically grater efficacy, a shorter treatment duration, and are administered orally (commonly a once – daily pill) rather than by injections.

32. These medications truly revolutionized the way HCV is treated. They cure 90-95% of patients with all types of HCV, have virtually no side effects, and can be taken as a once- daily pill for a mere ***12 weeks.***

33. The benefits of treatment with DAA drugs also include immediate decrease in liver inflammation, reduction in the rate of progression of liver fibrosis,

reduction in severe side effects, and a substantial reduction in the risk of liver cancer and liver- related mortality.

34. In response to the revolutionary DAA medications, the American Association for the Study of Liver Disease ("AASLD") and the Infectious Disease Society of America ("IDSA") formed a panel of experts to conduct an extensive, evidence – based review of the testing, management and treatment of HCV. The result of that review have been published in a comprehensive document called the HCV Guidance, which is updated regularly and is publicly available at *www.hcvguidelines.org.* The Center for Disease Control and Prevention ("CDC") encourages health care professionals to follow the HCV guidance.

35. The IDSA/ AASLD guidelines set forth the medical standard of care for the treatment of HCV, which is now well-established in the medical community.

36. The IDSA/ AASLD panel, through the HCV Guidance,  recommends immediate treatment  with DAA drugs for ALL persons with cHCV. This is the standard of care of the treatment of HCV, and it reflects the continuing medical research.

37. The Florida Department of  Children and Families ("DCF"), the agency responsible for administering the Medicaid program, DAA medications for HCV should be approved for ALL adult patients with an HCV diagnosis. DCF also specifically eliminated any requirement that there be any evidence of

hepatic fibrosis before covering treatment. Thus, DCF has recognized that the standard of care for HCV is to provide ***immediate treatment*** with DAA drugs to ALL patients with HCV, regardless of the stage of the disease.

38. Given the dramatic and undisputed benefits of DAA medications, the medical standard of care expressed through the HCV Guidance, is to immediately treat all patients with cHCV with DAA medications, regardless of the type of HCV or the stage of the patients disease.

39. It is important that DAA treatment be provided timely- i.e., as soon as the diagnosis is confirmed- because the treatment may be less effective for the patients with more advanced stages of the disease. Delay in treatment increases the risk that the treatment will be ineffective.

### *Screening, Diagnosis, and Monitoring of HCV:*

40. A person is generally diagnosed with HCV through a rapid blood test in which the blood is examined for HCV antibodies. A follow-up blood test determines whether genetic material of HCV remains in the blood. A third blood test can determine which variation, or genotype, of HCV a person has.

41. Although the standard of care is to treat ALL persons with HCV with DAA drugs, it is still useful to determine the progression of fibrosis and/or cirrhosis in the liver to choose the appropriate DAA drug, to treat other conditions or complications a person may be experiencing, to screen for liver cancer, to

advise patients about contraindications and drugs to avoid and to determine whether liver transplantation is necessary.

42. There are several methods used to determine the level of cirrhosis or fibrosis, along with an evaluation of the patients symptoms. One such method is a ***liver biopsy***, which is a surgery wherein a small sample of liver tissue is removed and histologically assessed. A typical biopsy evaluation method is a system called Metavir, which assigns a number corresponding to the amount of scar tissue on the liver, with 0 meaning no fibrosis and 4 meaning severe fibrosis or cirrhosis. A score of 2 or greater is considered significant fibrosis. Liver biopsies are generally regarded as the most accurate measure of fibrosis and cirrhosis, but they are not routinely recommended because they are invasive and potentially dangerous and also because they are generally unnecessary, as the standard of care is to treat ALL HCV patients, regardless of disease progression.

43. Other methods of assessing fibrosis and cirrhosis include blood tests, such as the ***APRI*** ("AST to Platelet Ratio Index") score. This score is a ratio derived by comparing the level of an enzyme in the blood called aspartate aminotransferase ("AST") with the usual amount of AST in the blood of a healthy person and the number of platelets in the affected person's blood. Generally, an APRI score greater then 0.7 indicates significant fibrosis and a score of 1.0 or greater

indicates cirrhosis. However, a low APRI score does not necessarily indicate the absence of fibrosis.

44. Another blood test is called the **FIB-4**, which is a ratio derived using the level of two enzymes in the blood, AST, and alanine aminotransferase ("ALT"), as well as platelet count and the person's age.

45. Standard ultrasounds or sonograms of the liver are unreliable indicator of the level of fibrosis, as advanced fibrosis may not be detected by these scans. However, more accurate ultrasounds do exist. As an example, Fibro Scan is a more accurate type of ultrasound known as transient elastograph that uses sound waves to determine the amount of fibrosis present in the liver.

46. In assessing the level of fibrosis or cirrhosis, the entire clinical picture must be taken into account, There is no one blood test, scan, or symptom that will accurately determine the extent of liver damage, and therefor relying solely on strict numerical cutoffs of any test result is inappropriate. Any abnormal test result or symptom should be taken as a sign of fibrosis or cirrhosis, but normal resulted in isolation cannot rule out fibrosis or cirrhosis.

47. Relying solely on the APRI score to make treatment decisions is not adequate or appropriate because APRI has significant limitations. First, when an APRI score is extremely high, it has good diagnostic utility in predicting severe fibrosis of cirrhosis, but low and mid-range scores may miss many individuals

who have significant fibrosis or cirrhosis. In fact, in more than 90% of HCV cases, an APRI score of at least 2.0 indicates that a person has cirrhosis, but more than half of people with cirrhosis will not have an APRI score of at least 2.0 Second, where a person has been diagnosed with cirrhosis or advanced fibrosis through some other means, a low APRI score does not negate the diagnosis- it should be presumed that the patient had cirrhosis. Third, because AST levels fluctuate from day to day, a decreased or normalized level does not mean the condition has improved, and even a series of normal readings over time may fail to accurately show the level of fibrosis or cirrhosis.

48. A health care provider must also evaluate a patient's symptoms and determine whether the liver disease is compensated of decompesated. Once the liver has advanced, scoring of the clinical degree of liver dysfunction is done using the Child-Pugh ("C-P") score, also termed the Child-Turcotte-Pugh ("CTP") score. Variables include the serum albumin and bilirubin, ascites, encephalopathy, and prothrombine time ( a measure of how well the blood clots). The score ranges from 5-15. Patients with a score of 5 or 6  have CTP class-A cirrhosis (well-compensated cirrhosis), those with a score of 7 to 9 have CTP class-B cirrhosis (significant functional compromise), and those with a score of 10 to 15 have CTP class-C cirrhosis (decompensated cirrhosis).

49. Once cirrhosis has developed, patients should also be followed with twice-yearly *alpha-fetoprotein* ("AFP") screens, which is a serum maker for the development of liver cancer. Increases in AFP indicate the possible presence of liver cancer.

50. Individuals with comorbid HIV (or other immune disorder) and HCV are at a much greater risk for more rapidly progressive liver disease and should be treated and closely followed.

### *Defendant's Unlawful Policy and Practice of Denying Hep C Treatment*

51. Despite consensus among medical professionals that ALL persons with cHCV should be treated with DAA drugs, Defendants each had a policy, practice and custom of not providing DAA medications to prisoners in the FDC-such as Mr. Curry- with HCV, in contravention of the prevailing standard of care and in deliberate indifference to the serious medical needs of prisoners with HCV.

52. Defendants' policies, practices and customs have caused, and continue to cause, the unnecessary and wanton infliction of pain and an unreasonable risk of serious damage to the health of Mr. Curry.

53. Although Defendants have policies governing the treatment of prisoners with HCV receive treatment, they did not follow them when they failed and/or refused to provide Mr. Curry with necessary DAA medications.

54. Rather, in practice, Defendants have set up a sham system that delayed and denied treatment to Mr. Curry.

## *The Effect on Mr. Curry*

55. Mr. Curry is a prisoner and has been confined to the FDC since January, 2015. When Mr. Curry was transferred to the FDC, the St. Lucie County Jail forwarded a portion of his medical records to inform FDC officials of his current medications (Hypertension) and his chronic illnesses (Stage- 4 cHCV). Despite knowing that Mr. Curry was classified with "advanced stage liver disease", a serious medical condition, and that he was in desperate need of DAA medication, the Defendants refused to provide any DAA medication that would eradicate his cHCV. The Defendants further knew the risk of withholding DAA medication would cause significant harm to Mr. Curry's liver and disregarded that risk for over 3 years.

56. On 2-24-15, Mr. Curry was transferred to Gulf Correctional Institution-Annex and placed under the care of Dr. Vilchez, MD.. An array of tests were performed (i.e., EKG, chest x-ray, labs, etc.). Mr. Curry advised Dr. Vilchez that he was diagnosed with "Stage- 4 cHCV" in 2013, and was in desperate need of treatment. Dr. Vilchez said "the FDC does not provide HCV treatment

because it is too expensive. There are thousands of inmates with HCV and it is just not practical".

57. On 4-28-15, Mr. Curry filed an informal grievance requesting to be seen by a liver specialist. He indicated that his liver was bulging out of his right side and that he was in a lot of pain. Also, that his tongue was raw and he had lost his sense of taste. The grievance was DENIED by K. Ake, Health Service Administrator, Gulf C.I.-Annex, indicating that Mr. Curry was enrolled in the Chronic Clinic and would be "monitored" as needed.

58. On 5-20-18, Mr. Curry was seen by Dr. Vilchez to discuss HCV treatment. Dr. Vilchez agreed that Mr. Curry's liver was in fact bulging out of his right side. Dr. Vilchez voiced a concern and ordered a "pre-dialysis diet" and ordered pain medication for 2 weeks. Dr. Vilchez also requested a consult with a liver specialist at the Reception Medical Center ("RMC"). Mr. Curry was transferred to RMC, received an ultrasound and was transferred back to Gulf C.I.- Annex without seeing a liver specialist. Mr. Curry would later learn that the consult was DENIED.

59. On diverse dates between July, 2015, and September, 2015, Mr. Curry was seen by Dr. Vilchez to discuss lab results and the declining condition of Mr. Curry's liver function. During this time, Mr. Curry noticed a "golf ball" size lump bulging out of his right side at the base of his ribcage and informed Dr. Vilchez.

Upon examination, Dr. Vilchez scheduled a CT Scan at RMC. Upon returning from RMC, Mr. Curry was seen by Dr. Vilchez on 09-23-15. Dr. Vilchez indicated that the CT Scan results showed a "fatty liver" and " the lump is 'probably' just a fatty deposit and there is nothing to worry about".

60. On 09-20-15, Mr. Curry elected to file a Direct Grievance with Ms. Jones, by-passing the institutional level as authorized by Ch. 33-103.006 (3)(e) Florida Administrative Code. Mr. Curry indicated "the reason for by-passing the institutional level [as required by rule] is because any further delay in receiving HCV treatment causes substantial risk to my health and puts my life in imminent danger". Mr. Curry advised Ms. Jones that he had a serious medical need that was being ignored by FDC's contract health care provider and they were refusing to provide HCV treatment. Mr. Curry further advised Ms. Jones that if his HCV is "left untreated [he] could develop full cirrhosis, liver cancer, liver failure and death". Ms. Jones elected to ignore Mr. Curry's "fair notice" that her subordinates were acting unlawfully. Ms. Jones made no attempt to stop them from doing so.  The grievance was "returned without action" indicating that " the reason that you provide for by-passing the facility is not acceptable".

61. On 10-02-15, Mr. Curry filed a Formal Grievance with Warden J. Blackwood, at Gulf C.I.-Annex, regarding the 09-23-15, consult with Dr. Vilchez. Warden

Blackwood and Dr. Vilchez DENIED the formal grievance indicating that " the result of the CT Scan was basically normal...." Mr. Curry respectfully disagrees. There is nothing "basically normal" about Stage-4 HCV with an inflamed liver, and now a "golf ball" size lump. Mr. Curry then filed a timely Grievance Appeal with Ms. Jones 5 days after receiving the Warden's response to the Formal Grievance. However, for reasons out of Mr. Curry's control, the grievance appeal was withheld somewhere between the Warden's office and Ms. Jones' office for 17 days. The grievance appeal was DENIED indicating that the grievance appeal must be received by the Secretary's Office within 15 days of the response date of the formal grievance. Ms. Jones' office is abusing their own policy to avoid HCV treatment.

62. Mr. Curry would continue to be seen by Dr. Vilchez and discuss HCV treatment, only to be continually denied for lack of funding.

63. On 09-21-16, Mr. Curry would be relocated to Okaloosa C.I. and was evaluated by Dr. Lopez, MD.. Mr. Curry informed Dr. Lopez about the lump on his Right side. After examination, Dr. Lopez said "yeah, that's a pretty good size lump" and ordered an ultrasound. Dr. Lopez also said that he was changing Mr. Curry's blood pressure medication because they were the wrong meds. Dr. Lopez explained that Mr. Curry's hypertension is "portal" and the increased blood pressure is caused by the amount of scarring of the liver, thus, restricting

the blood flow through the "portal vein" causing high blood pressure. Mr. Curry would have to take blood pressure medications for life. Mr. Curry asked Dr. Lopez about HCV treatment. Dr. Lopez said that he would put Mr. Curry on "the list" to be evaluated by the HCV committee.

64. On 10-17-16, Mr. Curry was given an ultrasound. When Mr. Curry asked the X-ray technician about the lump, she said " I was ordered not to photograph the lump-only the organs".

65. On 10-12-16, and 10-24-16, Mr. Curry was evaluated by Dentist- Dr Fournier, while at Okaloosa C.I., who informed Mr. Curry that he was changing the current dental plan because the current dental plan was 2 years old and due to the changes in Mr. Curry's bone structure all of his remaining teeth must be removed. Dr. Fournier explained that due to the Advanced HCV it is very common for patients to develop "bacterial periodontitis" where high levels of bacteria in the mouth erodes the bone and erodes the taste buds from the tongue. That, an antibiotic prophylaxis could have been prescribed to combat this, but, it's too late now. That, there is an extensive amount of bone loss and that all of the teeth must come out. Mr. Curry filed a Formal Grievance on 10-24-18, that was DENIED, indicating that Dr. Fournier's recommendation was in his best medical judgment.

66. On 01-27-17, Mr. Curry was again seen by Dr. Lopez who stated that Mr. Curry was still on "the list" for HCV treatment. Mr. Curry had recently received, from an outside source, a copy of FDC's Health Service Bulletin ("HSB") 15.03.09 Supp. #3 and asked Dr. Lopez what his APRI score was. Dr. Lopez stated that he didn't know, but, he would calculate it. Dr. Lopez went to another room with a computer and advised Mr. Curry that his APRI score was 1.9 and the Child-Pugh score was 6 ("class-A"). After reviewing the HSB, Mr. Curry noticed that an APRI of 1.9 was *one-tenth* of a point from being classified a "High Priority for Treatment" and a Child-Pugh score of 6 is *one point* from decompensated cirrhosis, essentially liver failure.

67. On 02-20-17, Mr. Curry filed a Formal Grievance with Warden R. Hodges, at Okaloosa C.I., indicating that Dr. Lopez was not following the HCV infection protocols for properly evaluating HCV and for refusing to order the appropriate treatment regimens in accordance with FDC's HSB, and that Dr. Lopez told Mr. Curry that, although the 2013 liver biopsy, and other tests , indicate a High Risk for complications and disease progression that would require a more urgent consideration for treatment, FDC is not treating any HCV inmates and does not plan to without civil litigation and additional Congressional budgeting. Warden Hodges responded stating, " you are monitored every 90 days... Your current APRI score is 1.9... Your case has been reported with all labs required into the

monthly tracker to be considered for treatment, " essentially repeating what Mr. Curry wrote in his grievance, then DENIED the grievance. Mr. Curry then filed a timely Grievance Appeal with the Secretary of FDC, Ms. Jones, on 03-09-17. Ms. Jones' office did not respond until 4 months later on 07-07-17, indicating that " your treatment is being *deferred* at this time. In the meanwhile, you will continue to be monitored in the illness clinic…Should you experience problems, sick call is available…" (emphasis added). Again, Mr. Curry attempts to give Ms. Jones " fair notice" that he has serious medical condition that has deteriorated to a dangerous levels and that qualifies him for High Priority treatment, per FDC's HSB, and that her subordinates were acting unlawfully by ignoring the HSB guidelines and refusing to provide HCV treatment. Ms. Jones again fails to respond reasonable to Mr. Curry's "fair notice" and elected to "defer" Mr. Curry's HCV treatment and ignore the protocols of FDC's HSB causing further damage to Mr. Curry's liver.

68. Defendants' deliberate indifference to Mr. Curry's serious medical needs caused his liver to deteriorate and his condition has progressively gotten worse ever since. Despite Mr. Curry's grave medical condition, he was wrongfully denied HCV treatment.

## COUNT 1 – VIOLATION OF 42 U.S.C. § 1983

### DELIBERATE INDIFFERENCE

## (AS TO ALL DEFENDANTS)

69. Mr. Curry re-alleges the factual allegations in paragraphs 1 through 68 as if fully sets forth herein.

70. Defendants were well aware of Mr. Curry's grave medical needs, yet they intentionally failed and, indeed, callously refused to provide necessary treatment to address those medical needs. Such conduct has harmed Mr. Curry, causing, Mr. Curry continued suffering and exposure to liver failure and other serious medical conditions, including, but not limited to, liver cancer and death.

71. Defendants caused the wanton infliction of pain upon Mr. Curry and exhibited deliberate indifference to the serious medical needs of Mr. Curry, in violation of the Eighth Amendment. Defendants at all times have been aware of the substantial risk of serious and actual harm facing Mr. Curry as a result of his medical condition, specifically cHCV.

72. Defendants disregarded the easily perceived harms by failing to provide vital medication to Mr. Curry. Accordingly, Defendants were deliberately indifferent to the substantial risk of serious harm to Mr. Curry.

73. By denying Mr. Curry his medically needed cHCV treatment, Defendants imposed punishment far in excess of that authorized by law, contrary to the Eighth Amendment.

74. Defendants' denial of Mr. Curry's medically necessary cHCV treatment violates all standards of decency, contrary to the Eighth Amendment.

75. Defendants' actions with respect to Mr. Curry amounts to grossly inadequate care.

76. Defendants' actions with respect to Mr. Curry's medical care were co cursory as to amount to no medical care at all.

77. As a direct and proximate cause of this pattern, practice, policy, and deliberate indifference, Mr. Curry has suffered and continues to suffer from harm in violation of his Eighth Amendment rights.

## COUNT 2 – VIOLATION OF 42 U.S.C. § 1983

### FAILURE TO SUPERVISE – ADEQUATE MEDICAL CARE

### (AS TO DEFENDANT JULIE L. JONES)

78. Mr. Curry re-alleges the factual allegations in paragraphs 1 through 68 as if fully set forth herein.

79. At all relevant times hereto, Ms. Jones, by and through her agents and employees, acted within the authority and under color of state law, failed adequately to supervise her agents and employees, including Dr. Vilchez, MD., and Dr. Lopez MD., to provide adequate medical care to prisoners in the FDC despite the need for such supervising.

80. Such conduct constitutes a deliberate indifference to the constitutional rights of Mr. Curry and is actionable under 42 U.S.C. § 1983 as a violation of the United States Constitution.

81. As a direct and proximate result of the willful and deliberate actions or inactions of Ms. Jones' deliberate indifference to Mr. Curry's serious medical needs, Mr. Curry has experienced loss of enjoyment of life, loss of quality of life, severe pain and suffering, and monetary loss for future earnings.

## COUNT 3 – VIOLATION OF 42 U.S.C. § 1983

## INADEQUATE MEDICAL CARE

### (As to Dr. Vilchez, MD., and Dr. Lopez, MD.)

82. Mr. Curry re-alleges the factual allegations in paragraphs 1 through 68 as if fully set forth herein.

83. At all relevant times hereto Dr. Vilchez and Dr. Lopez,  acted within the scope of their employment and under color of state law, either alone or acting in conspiracy, for delaying or denying to provide reasonably adequate care for the serious medical needs of Mr. Curry, reflecting a deliberate indifference to the constitution rights of Mr. Curry, which is actionable under 42 U.S.C. § 1983 as a violation of the United States Constitution.

84. As a direct and proximate result of the willful and deliberate actions or inactions of these Defendants deliberate indifference to Mr. Curry's serious

medical needs, Mr. Curry has experienced loss of enjoyment of life, loss of quality of life, severe pain and suffering, and monetary loss for future earnings

## COUNT 4 – VIOLATION OF STATE LAW

### NEGLIGENCE

### (As to All Defendants)

85. Mr. Curry re-alleges the factual allegations in paragraphs 1 through 68 as if fully set forth herein.

86. At all relevant times hereto, Defendants, individually and by and through their agents and employees, acted within the scope of their authority,  were intentionally negligent in failing to provide Mr. Curry with the adequate Medical care needed to treat his HCV.

87. As a direct and proximate result of the foregoing, Mr. Curry has experienced loss of enjoyment of life, loss of quality of life, severe pain and suffering, and monetary loss for future earnings.

## COUNT 5 – STATE LAW CLAIM NEGLIGENT SUPERVISING

### (As to Defendant Julie Jones)

88. Mr. Curry re-alleges the factual allegations in paragraphs 1 through 68 as if fully set forth herein.

89. At all relevant times hereto, Ms. Jones, by and through her agents and employees acted within the scope of employment and authority, gave Dr. Vilchez and Dr. Lopez the authority to provide for Mr. Curry's medical needs.

90. Defendants owed Mr. Curry a duty to provide him with reasonable adequate medical care during his incarceration and to supervise her agents and employees to ensure that reasonably adequate medical care is provided and continues to be provided.

91. Ms. Jones was intentionally negligent in failing to supervise Dr. Vilchez and Dr. Lopez to ensure that reasonably adequate medical care was provided to Mr. Curry.

92. As a direct and proximate result of the negligent supervising by Ms. Jones, Mr. Curry has suffered loss of enjoyment of life, loss of quality of life, severe pain and suffering, and monetary loss for future earnings

## COUNT 6 – VIOLATION OF THE

## AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12131, et seq.

### (As to Defendant Julie L. Jones)

93. Mr. Curry re-alleges the factual allegations of paragraphs 1 through 68 as if fully set forth herein.

94. This count is brought under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* and 42 U.S.C. § 12131- 12134, and its implementing regulations.

95. Defendants each qualify as a "public entity" within the meaning of 42 U.S.C. § 12131 (1), and 28 C.F.R. § 35.104.

96. At all times relevant hereto, Mr. Curry had cHCV, which is a physiological disorder or condition that effects one or more body systems, including, but not limited to, the digestive, gastrointestinal, immune, circulatory, cardiovascular and hemic systems and is therefore a physical impairment. 42 U.S.C. § 12103 (1) and (2); 28 C.F.R. § 35.108 (a) and (b). This physical impairment substantially limits one or more major life activities, including, but not limited to, eating, walking, bending, lifting, concentrating, thinking and communication; the operation of major bodily functions, such as digestive, gastrointestinal, immune, circulatory, cardiovascular and hemic systems; and the operation of the liver. 42 U.S.C. § 12102 (2); 28 C.F.R. § 35.108 (c).

97. Mr. Curry has a record of having an impairment that substantially limits one or more major life activities as he has a history of such impairment. 42 U.S.C. § 12102 (1)(B); 28 C.F.R. § 35.108 (a)(1)(ii)and (e).

98. Mr. Curry is regarded by Defendants as having as impairment that substantially limits one or more major life activities, as Defendants perceive him as having

such impairment. 42 U.S.C. § 12102 (1)(c)and (3); 28 C.F.R. § 35.108 (a)(1)(iii) and (f). Defendants have subject Mr. Curry to a prohibited action because of an actual or perceived physical impairment.

99. Mr. Curry is a qualified individual with a disability because he meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by Defendants, including but not limited to, medical services. 42 U.S.C. § 12131 (2); 28 C.F.R. § 35.104.

100. By withholding HCV medical treatment from Mr. Curry, but, not withholding medical treatment from those with other disabilities or those who are not disabled, Defendants excluded Mr. Curry from participating in, and the benefits of, Defendants' services, programs and activities (such as medical services), because of his disability. 42 U.S.C. § 12132; 28 C.F.R.> § 35.130 (a).

101. By withholding HCV medical treatment from Mr. Curry, but, not withholding medical treatment from those with other disabilities or those who are not disabled, Defendants subject Mr. Curry to discrimination. 42 U.S.C., § 12132; 28 C.F.R. § 35.130 (a).

102. Defendants failed to provide Mr. Curry with equal access and enjoyment of effective medical services. 28 C.F.R. § 35.130 (b)(1).

103. Defendants utilized criteria or methods of administration that have the effect subjecting Mr. Curry to discrimination and that defeated or substantially

impaired accomplishment of the objectives of medical treatment for HCV. 28 C.F.R. § 35.103 (b)(3).

104. Defendants have known about the violations noted herein, but, have failed to correct them, thereby exhibiting deliberate indifference to the rights of Mr. Curry.

105. As a direct and proximate cause of these actions and omissions, Mr. Curry has suffered and continues to suffer from harm in violation of his ADA rights.

## COUNT 7 – REHABILITATION ACT, 29 U.S.C. §§ 791-794a

### (As to Defendant Julie L. Jones)

106. Mr. Curry re-alleges the factual allegations of paragraph 1 through 68 as if fully set forth herein.

107. This count is brought under Section 504 of the Rehabilitation Act, 29 U.S.C. § 701, *et seq.* and 29 U.S.C. §§ 791-794, *et seq.*, and its implemented regulations.

108. Defendants are a program or activity receiving federal financial assistance 29 U.S.C. § 794.

109. Defendants denied Mr. Curry- a qualified individual with disabilities – access to, the benefits of several programs or activities, solely because of his disability. 29 U.S.C. § 794 (a); 28 C.F.R. § 42.503 (a).

110.   Defendants denied Mr. Curry the opportunity accorded others to participate in programs of activities. 28 C.F.R. § 42.503 (b)(1).

111.   Defendants subjected Mr. Curry to discrimination. 29 U.S.C. 794 (a).

112.   Defendants utilized criteria or methods of administration that either purposely or in effect discriminate on the basis of handicap and defeat or substantially impair accomplishment of the objectives of Defendants' programs or activities with respect to handicapped persons. 28 C.F.R. § 42.503 (b)(3).

113.   Defendants have known about the violations noted herein but, have failed to correct them, thereby exhibiting deliberate indifference to Mr. Curry's rights.

114.   As a direct and proximate cause of this exclusion, Mr. Curry has suffered and continues to suffer from harm and violations of his rights under the RA.

## PRAYER FOR RELIEF

**WHEREFORE**, Mr. Curry demands a judgment as follows:

A. Judgment for actual and compensatory damages, including, but not limited to, mental and physical pain and suffering , and medical expenses;

B. Judgment for punitive damages against the Defendants;

C. An award of reasonable attorneys' fees and costs (if applicable) pursuant to 42 U.S.C. § 1988, as to those counts alleging federal claims to which attorneys' fees are recoverable;

D. Any other equitable and legal relief which the Court deems appropriate to remedy the violations of federal law pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 12131 *et seq.*, 29 U.S.C. § 791, *et seq.*, and state law.

## DEMAND FOR JURY TRIAL

Mr. Curry demands a trial by a jury as to all issues.

Respectfully Submitted,

David T. Curry, *Pro se*

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the forgoing motion has been placed in

the hands of Hamilton Correctional Institution Annex officials for mailing to:

Office of the Attorney General
Civil Division
The Capitol PL–01
Tallahassee, Florida 32399–1050

United States District Court
Northern Florida
111 N. Adams St., Ste. 232
Tallahassee, Florida 32301-7730
(on behalf of Dr. Vilchez Gulf C.I. –
Annex)

Francolin Dolney, Esq.
121 Orange Ave., #1500
Orlando, Fl 32801

On this _19th_ day of October, 2018.

Respectfully Submitted,

David T. Curry # 106409, *Pro se*
Hamilton Correctional Inst. - Annex
10650 S.W. 46th Street
Jasper, Florida 32052

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

DAVID T. CURRY
Plaintiff.

CASE NO.: 2:18-cv-207 RH/CAS

Vs.

JULIE L. JONES, *et al.*
            Defendants
_____/

[PROPOSED] ORDER GRANTING PLAINTIFF'S MOTION FOR LEAVE TO
AMEND COMPLAINT

**THIS MATTER** came before the Court upon Plaintiff, David T. Curry

Motion for Leave To Amend Complaint. The Court, having considered the Motion

and finding good cause to grant the Motion it is here:

**ORDERED AND ADJUDGED:**

1.  Plaintiff's Motion for Leave to Amend Complaint is hereby granted.

2.  The Amended Complaint attached to Motion shall be deemed filed as of the

    date of this Order.

**DONE AND ORDERED** in chambers in Tallahassee, Florida this_____

day of _____ ,2018          _____

                              UNITED STATES DISTRICT JUDGE

FILED USDC FLND TL
  OCT 23 '18 PM12:18

34



David Curry, #106409
Hamilton Correctional Institution Annex
10650 Southwest 46th Street
Jasper, FL 32052

CHECKED OCT 2 3 2018

U.S. District Court
Northern District, Florida
111 No. Adams St. # 232
Tallahassee, FL 32301-7730

